**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANNA DRAGICEVICH, | |
| Plaintiff, | |
| | No. 23 CV 15641 |
| v. | |
| | Judge Manish S. Shah |
| SKECHERS USA, INC., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anna Dragicevich was a sixty-one-year-old female employee of defendant Skechers USA, Inc. who was fired for what Skechers says was insubordination and lack of preparation and engagement in team meetings. Dragicevich alleges discrimination on the basis of age in violation of the Age Discrimination in Employment Act, and retaliation under Title VII of the Civil Rights Act of 1964. Skechers moves for summary judgment. For the reasons discussed below, the motion is granted in part and denied in part.

## I. Legal Standards

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant is entitled to summary judgment if the plaintiff "cannot present sufficient evidence to create a dispute of material fact regarding any essential element of her legal claims on which she bears

1

the burden of proof." *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir. 2017). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

## II. Facts

### A. Conduct at buy meetings and sales conferences

Plaintiff Anna Dragicevich worked for the Women's Juniors team at defendant Skechers USA from the summer of 2016 to May 2023. [43] ¶¶ 5–6, 44.[1] Her supervisor on the team was Christina Gigante. [43] ¶ 6.

In the spring of 2017, when Dragicevich was fifty-five years old, another team member quit, and Dragicevich took over her accounts, which were the three largest accounts on the team. [41-1] at 22–24 (75:16–77:6, 77:1–15); [43] ¶ 7. Dragicevich generated more annual revenue than anyone else on the team and had the largest volume and accounts on the team. [54] ¶ 1; [54-1] at 3–4 (29:14–19, 29:24–30:3), 38 (212:5–6). There were three other remaining team members in spring 2017: Josh

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the plaintiff's response to defendant's Local Rule 56.1 statement of facts, [43], and defendant's response to plaintiff's statement of additional facts, [54], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). *See also* [54] ¶¶ 9, 34, 38 (inadmissible hearsay). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see* [54] ¶¶ 5 n.5, 6 (portions). The parties dispute many facts, but the facts in those disputes are not all material. *See* [43] ¶¶ 1–4, 17, 42, 47, 49, 51, 53–56, 64, 66, 69, 71, 73–77; [54] ¶¶ 1 (portions), 3 (portions), 4 (portions), 7 (portions), 8, 14 (portions), 16–17, 19–33, 35–37, 39–40. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions, understanding that the nonmovant is entitled to favorable inferences.

Olkes, Jessica Weakley Anspach, and Jenny Moss, all of whom were under forty years of age. [43] ¶ 9. In her role, plaintiff worked directly with Skechers's highest volume accounts to sell Skechers products. [43] ¶ 8. This required her to attend meetings with her team and customers, including customer-facing "buy meetings," where she would sell product and present upcoming product lines directly to her customers. [43] ¶ 8. Buy meetings would take place in person over a three-week period and were considered critical for sales purposes. [43] ¶ 26. At the buy meetings, team members were expected to help one another by cleaning tables, styling products, taking photos of the product, and taking notes for each other. [43] ¶ 27. Skechers also had twice-a-year internal sales conferences, which consisted of meetings and presentations over two-and-a-half days about marketing, sales strategy, and new and existing product lines. [43] ¶ 29. During the sales conferences, Gigante would set and communicate break times. [43] ¶ 30.

In 2021, Dragicevich approached Gigante to express an interest in a management position, but none were available. [43] ¶ 10. After their conversation about a management role, Gigante felt that Dragicevich's demeanor toward her "completely changed." [41-3] at 11 (43:4–5). Gigante said she thought that Dragicevich seemed "standoffish" and "closed off" toward her at a sales conference in September and at buy meetings in October of that year. [43] ¶ 11; [41-3] at 11–12 (43:10–44:3). Dragicevich said that she would describe her interactions with Gigante during the buy meetings as "professional," and that their relationship at that point "was good." [43-2] at 27 (79:15–18), 28 (80:1–4).

3

In October 2021, Dragicevich told Gigante that Gigante's father, Robert Gigante, a Skechers Vice President of Sales, told her to "shut up, bitch," at a dinner event with a Skechers client earlier that year. [43] ¶ 63. Gigante told Dragicevich to go to Human Resources to report the comment, but Dragicevich said she wanted to move on from the comment without going to HR. [43] ¶ 65.

In December, Gigante held an informal performance review (Skechers does not conduct regular or formal performance reviews for sales employees). [43] ¶ 12. During this review, Gigante told Dragicevich that she was concerned that Dragicevich had "attitude" and that her attitude needed to change. [43] ¶ 13; [41-1] at 27 (84:6–7); [41-3] at 10 (42:9–12), 13 (45:2–7). Dragicevich said that she was "taken aback" by this and apologized if it appeared that way to Gigante. [41-1] at 27 (84:6–8, 16–18). In the same review, Dragicevich said, Gigante told her "how great [she] was at [her] job." [41-1] at 27 (84:21–22). Following this performance review, Gigante said that Dragicevich did not improve. [43] ¶ 14.[2] Instead, Gigante and other team members said that plaintiff was not engaged with the team or her role. [43] ¶ 15; [41-3] at 17–18 (51:6–52:3); [41-8] ¶¶ 7–8; [41-9] ¶¶ 6–7; [41-10] ¶ 6.[3]

---

[2] Dragicevich disputes this, but her response does not address the asserted fact.

[3] Dragicevich disputes this and claims that evidence from former team members should not be admitted because they lack sufficient personal knowledge of Dragicevich's actions and are not reliable because they have a strong bias and self-interest in cooperating with their current employer. Dragicevich's challenges to these statements based on bias are credibility questions reserved for a jury. *Whitaker v Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025). I find that the affidavits of each team member are sufficiently supported by personal knowledge and, if an opinion, rationally based on the witness's perception, helpful to determine a fact in issue, and not based on any specialized knowledge. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 701, 704(a). Each affidavit discusses the team member's personal conversations with Dragicevich or their observations at in-person buy meetings and sales conferences and their opinions based on their personal observations. *See* [41-8] ¶¶ 5–11; [41-9] ¶¶ 3–10; [41-10] ¶¶ 3–9.

After an April 2022 buy meeting, Gigante said she spoke with Dragicevich about her preparation and presentation and then began to send out emails to the entire team where she set "clear" expectations before buy meetings. [43] ¶ 33; [41-3] at 24 (59:4–9), 25 (60:8–23). Gigante would ask for certain documents to be emailed to her before the meetings. [41-1] at 36 (106:15–19). There was a list of nine expectations sent out in her email; Gigante said Dragicevich failed to meet the expectations but could not recall that there was any specific item that Dragicevich did not bring to the buy meetings. [43] ¶ 34; [41-3] at 20–21 (54:18–55:22), 54–55 (134:6–135:10); [43-3] at 24 (135:6–10). Dragicevich disputes that Gigante's directives were "clear" and says she would receive contradictory instructions: "One moment you're sitting. One moment she wants you to get the samples. ... So if I tried to sit and takes notes, it was wrong. So it was not a clear directive." [43-2] at 82 (209:4–10); 80 (207:4–20) (Dragicevich testifying that the directions in Gigante's emails were different than the directions in subsequent Teams calls). Dragicevich also stated that she remembered helping other team members at meetings, though she couldn't remember specifically what meetings. She said, "I will tell you I would never not help somebody," and that "if a rep was there, I'd ask them if you need my help, please ask." [43-2] at 68 (146:13–24). Dragicevich said that "every buy meeting I'd say, if you guys need something, let me know." [43-2] at 69 (147:4–6).

---

However, I do not rely on the observations of the former team members in support of Gigante's decisions where there is no evidence that Gigante knew about these observations or considered them in terminating Dragicevich. *Cf. Lohmeier v. Gottlieb Mem'l Hosp.*, 147 F.4th 817, 828 (7th Cir. 2025); *Khungar v. Access Comm'y Health Network*, 985 F.3d 565, 574 (7th Cir. 2021). *See also* [43] ¶ 20.

Gigante testified that she met with Human Resources in the summer and fall of 2022 to discuss plaintiff's performance issues. [43] ¶ 25; [41-16] at 6–7 (53:19–54:8), [41-3] at 59–60 (164:24–165:17). Gigante said that she worked with Dragicevich throughout 2022 to address Dragicevich's performance and engagement with the team. [43] ¶ 16; [41-3] at 18 (52:11–16), 25 (60:2–14), 56–57 (146:6–147:7). She testified that she and Dragicevich "constant[ly]" discussed that the two of them should have better dialogue going forward and that they would both try to be more open about what was bothering each of them. [54] ¶ 2; [54-1] at 13–14 (130:17–131:13). Gigante never told Dragicevich that her job was in jeopardy if her behavior did not improve. [54] ¶ 2.

Gigante testified that in September 2022, she told Pete Calichman, her supervisor and the Senior Vice President of Domestic Sales and Marketing, that Dragicevich was not prepared for buy meetings. [43] ¶ 28; [41-3] at 20 (54:2–15); [43] ¶ 40. Gigante said that "in multiple meetings, at multiple buy meetings and multiple quarterly meetings, she was unprepared." [41-3] at 20 (54:22–24). Gigante also testified that another team member told her that Dragicevich was not helping anyone during the buy meeting. [41-3] at 32 (81:3–13). Gigante said that during buy meetings, "everyone else was helping each other and [Dragicevich] left." [41-3] at 34 (91:6–9). Gigante also talked about "highlights and lowlights overall of some team members," including Olkes, Weakley Anspach, Moss, and two others. [54] ¶ 3. Plaintiff testified that she was prepared for her meetings in October 2022 specifically, and that she was "always prepared" for all of her buy meetings. [43-2] at 41–42

(102:19–20, 102:24–103:6), 47 (111:9–11). She testified that she "always" had a "curated matrix" for every meeting. [43-2] at 45 (106:10–14). Plaintiff testified that specifically for the October 2022 buy meeting, she recalled creating necessary documents before the meeting started. [43-2] at 41–42 (102:9–103:6).

Gigante said that multiple team members approached her to voice concerns about Dragicevich and her negative impact on the team after a September 2022 buy meeting. [43] ¶ 23; [43-3] at 9–10 (84:18–85:5). Dragicevich points out that Gigante's testimony that Weakley Anspach spoke with Gigante after the September 2022 meetings is inconsistent with Weakley Anspach's declaration, which states that Weakley Anspach "expressed [her] concerns to Ms. Gigante in March of 2022." [41-9] ¶ 9.

In December 2022, Gigante conducted another informal performance review with Dragicevich. Gigante said she "advised [Dragicevich] that [Gigante] could tell that she wasn't happy." [43] ¶ 24; [41-3] at 18 (52:9–10).[4] Plaintiff testified that Gigante did not raise any comments during the meeting about her attitude or happiness at work. [43-2] at 53 (122:2–7). She also testified that Gigante was "actually complimentary" of Dragicevich, told her she "d[id her] job," and said she was "prepared." [43-2] at 49-50 (116:19–117:2).

In January 2023, Dragicevich and Gigante attended a quarterly set of meetings for one of Dragicevich's customers. [43] ¶ 35. Dragicevich missed one of the meetings

---

[4] Skechers also cites to Gigante's internal notes from this meeting to support its asserted fact. [41-11]. These notes are hearsay, and Skechers does not establish any hearsay exception, so I do not consider them.

with the customer, and Gigante conducted the meeting alone. [43] ¶ 36. But Dragicevich said that the meeting started early, and she was never told it was starting early. [43] ¶ 37; [41-1] at 41 (124:22–24), 42 (125:18–20), 44 (127:13–14); [43-2] at 54 (124:18–24). When Dragicevich told Gigante she was never informed of the change in time, Gigante stuck her finger in Dragicevich's face and responded that she was not Dragicevich's "babysitter." [43] ¶ 37; [41-1] at 43 (126:13–15).

Gigante said Dragicevich's "behavior during [the March 2023] conference … was repetitive behavior from all previous conferences since the back half of … 2021," which "was dismissive, not wanting to be there, showing zero effort, not being part of the team, not—just not partaking in the active teamwork that goes on in the two and a half days that we are there." [43] ¶ 31; [41-3] at 44 (101:4–12).

Gigante testified that because Dragicevich "had the largest territory and volume on the team, it was crucial for her to take part in the meetings, be present, physically present, and present giving her feedback and her opinion." [43] ¶ 32; [41-3] at 33 (90:16–22). She continued: "Without … her feedback, her opinion, her strategy, her partaking in any teamwork it was disrespecting the team." [41-3] at 33–34 (90:23–91:2).[5]

---

[5] Dragicevich disputes this fact, and says that Gigante was complimentary of her, that Gigante noted that she was prepared, and that Gigante never spoke to her about her "conduct during the buy meetings," helping more, or being prepared. [43-2] at 46–47 (110:24–111:11); 49-50 (116:19–117:3). However, Skechers's asserted fact was about *sales conferences*, not buy meetings, so Dragicevich's response does not contradict the asserted fact.

8

### B.     Conduct outside meetings and conferences

Dragicevich and other team members would complain to each other and criticize Gigante. [43] ¶ 19; [54] ¶ 14. For example, Dragicevich and team member Josh Olkes would text each other openly criticizing Gigante. [43] ¶ 21; [54] ¶ 10. Weakley Anspach also called and texted Dragicevich about an issue she had with Gigante. [54] ¶ 14; [54-5] at 14–16 (188:17–190:1). She would call Dragicevich about Gigante and they would discuss "managing" Gigante. [54] ¶ 14; [54-5] at 16 (190:1–7).

At some point, Olkes went to Gigante to show her text messages between him and Dragicevich, telling her that the conversations were not something he was proud of taking part in. [43] ¶ 22; [43-3] at 10 (85:6-9), 12 (88:4-10). In response, Gigante said, "This isn't going to be held against you. Share with me what you feel comfortable." [54] ¶ 13; [43-3] at 12 (88:10-11). Olkes was never disciplined for his part in the text messages. [54] ¶ 13. When asked about her response to Olkes's participation, Gigante said, "it's pretty natural for people to complain about their boss." [54] ¶ 11; [43-3] at 12 (88:20-23). She also testified that "I think that these are two reps that are venting about work. That is what I think that is, and they have the right to their opinions." [54] ¶ 12; [43-3] at 52 (208:3–9). She admitted that the comments Olkes made were "unflattering," "inappropriate," and "not nice," but did not know the context around the conversations. [54] ¶¶ 10–11. She testified that despite that, she did not think the comments were undermining. [54] ¶ 11.

Olkes also told Gigante that he told Dragicevich he couldn't "take [Weakly Anspach] anymore," which he told Gigante. [54] ¶ 14; [43-4] at 18. Gigante said that she had never been told that Weakley Anspach was a "major issue," but did say she believed that "the way that [Weakley Anspach] was getting her answers or working with the team during sales conference came off a bit abrasive," and she thought it "rubbed people the wrong way." [54] ¶ 15; [43-3] at 58 (218:12–21). There is no evidence that Weakley Anspach, who remained employed by Skechers, was disciplined for how she interacted with the team. [54] ¶ 15.

### C. Dragicevich's termination

In February 2023, Dragicevich went to HR and complained that she felt targeted by Gigante after their October 2021 discussion where Dragicevich told Gigante that her father had told her to "shut up, bitch." [43] ¶¶ 52, 67. Dragicevich said she felt targeted because (1) Gigante was upset or short with her; (2) Gigante told Dragicevich she was "not her babysitter" and stuck her finger in Dragicevich's face; and (3) Gigante told Dragicevich that she had an "attitude" in December 2021. [43] ¶ 68. Dragicevich told HR she wanted to resolve the issues on her own and did not want HR to take action. [43] ¶ 70. Gigante did not know that Dragicevich met with HR. [43] ¶ 72.

Gigante met with HR in January 2023 and April 2023 to discuss her concerns about Dragicevich. [43] ¶ 39; [41-3] at 39–40 (96:5–97:11), 41 (98:2–13), 42 (99:15–19); [43-7] at 8–9 (60:21–61:9), 14–15 (67:11–18, 67:22-68:3). In April, Gigante spoke with HR to inform them of her decision to terminate Dragicevich. [43] ¶ 39. Gigante

requested approval to fire Dragicevich from her supervisor Calichman. [43] ¶ 40. Calichman approved the termination but was not substantively involved in the decision. [43] ¶ 41. While the Skechers HR department assisted Gigante with firing Dragicevich, it also was not substantively involved in the decision and did no independent investigation of its own. [43] ¶ 43; [43-7] at 22–23 (78:12–79:17); [41-16] at 21 (68:10–13) (decision to terminate plaintiff was already made by the time Gigante spoke with HR).

Dragicevich was officially terminated in May 2023. [43] ¶ 44. Gigante said her position was eliminated because of Dragicevich's "insubordination, ill preparation over the 22 months that we were discussing this for buy meetings and her meetings, and … her negative feelings towards the team and the environment that she was creating for the team." [43] ¶ 38; [41-3] at 65 (175:6–23). Despite this, Gigante also believed plaintiff was "well respected" and "very well liked" by her accounts and "had very healthy and strong relationships with her account base, with management at other companies, [and] with her merchant teams." [54] ¶ 1. Gigante said that it was a consistent theme that plaintiff received positive feedback from merchant teams and told Dragicevich that she was in her role because she was "good at what she did." [54] ¶ 1.

In its internal HR system, Skechers initially coded Dragicevich's termination as an "unsatisfactory performance action," but later changed it to a "position elimination." [43] ¶ 45; [54] ¶¶ 4–5. A Skechers HR representative said that there were some changes happening in the sales division, and that she understood that

there would be restructuring happening. [54] ¶ 5; [43-7] at 28 (95:13–22). The HR representative said the change in coding did not more accurately reflect the reasons for Dragicevich's firing, but that "it just made sense to administratively have the process happen at the same time with" Dragicevich's termination. [43] ¶ 46; [43-7] at 29 (96:6–9), 29–30 (96:20–97:1). She said she understood the change in the reason was to give Dragicevich a "softer landing" and offer her severance. [41-16] at 27 (97:2–7). Ultimately, the HR representative said that the "reasons for termination were different than the code that was placed in the system." [43] ¶ 46; [54] ¶ 6; *see also* [43-7] at 31 (100:20–22) ("We separated her based on her performance and coded it in the system as elimination of position."). Dragicevich was only told that her position was being eliminated, not that she was being let go for performance-based issues. [54] ¶ 7.

After Dragicevich was terminated, Gigante redistributed Dragicevich's account assignments to Olkes and Weakley Anspach based on their regional proximity to the accounts. [43] ¶ 48. No one was hired to replace Dragicevich. [43] ¶ 50.

## III. Analysis

### A. Age Discrimination

The Age Discrimination in Employment Act prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). At summary judgment, a "court must consider all the evidence in the record to determine whether a reasonable jury could find that the plaintiff suffered

12

an adverse action *because of* her age." *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 469 (7th Cir. 2025) (internal citations and quotations omitted) (emphasis in original). Under the "holistic" approach acknowledged in *Ortiz v. Werner Enterprises*, "all evidence belongs in a single pile and must be evaluated as a whole" to determine whether it allows an inference of prohibited discrimination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016); *Arnold*, 142 F.4th at 469.

In an "alternate route, a plaintiff can present her case by relying on the burden-shifting framework first enunciated in *McDonnell Douglas Corp. v. Green*." *Arnold*, 142 F.4th at 469 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that framework, the plaintiff must make a prima facie case of discrimination. If the plaintiff does so, the defendant must "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 470. The burden then shifts back to the plaintiff to show evidence that there is a genuine dispute about whether the stated reason was a pretext for discrimination. *See id.*

To make out a prima facie case of discrimination, a plaintiff must show that, *id.* at 469–70:

> (1) she is a member of the protected class (people over forty years of age);
> (2) she performed her job to her employer's legitimate expectations;
> (3) she suffered an adverse employment action; and
> (4) one or more similarly situated individuals outside her protected class received better treatment.

"Regardless of the framework, we ultimately consider all admissible evidence as a whole 'and determine whether a reasonable jury could find that the plaintiff

suffered an adverse action because of [her] protected characteristics.'" *Anderson v. Mott Street*, 104 F.4th 646, 652–53 (7th Cir. 2024) (quoting *Singmuongthong v. Bowen*, 77 F.4th 503, 508 (7th Cir. 2023)).

Skechers disputes that Dragicevich performed her job to her employer's legitimate expectations and that Dragicevich has put forth any proper comparator. I may "skip the *McDonnell Douglas* prima facie analysis if the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio v. U.S. Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). Skechers says that Dragicevich's failure to prepare for and engage in meetings, insubordination, and negative impact on the team made her fail to meet Skechers's legitimate employment expectations. The "issues of satisfactory performance and pretext overlap," and I can "proceed directly … to pretext." *Id.* (quoting *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023)).

Dragicevich has evidence of pretext. To establish pretext, an employee must show by a preponderance of the evidence that (1) "the employer was more likely motivated by a discriminatory reason," or (2) "the employer's proffered reason is unworthy of credence." *Arnold*, 142 F.4th at 473. "[A]n employer's dishonest explanation of a decision can, *by itself*, support an inference that its real reason was unlawful." *Vichio*, 88 F.4th at 695 (internal quotations omitted) (emphasis added). The fact that an employer did not offer any of the rationales it offers at summary judgment at the time it fired the employee "calls into question whether any of [the proffered reasons for termination] actually motivated the firing, so [they] could easily

be deemed pretexts." *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 813 (7th Cir. 2017). No additional evidence of unlawful discrimination is necessary. *Vichio*, 88 F.4th at 694–95. "[W]hen a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 911 (7th Cir. 2025).

Dragicevich's termination papers show she was terminated due to a "position elimination" and Dragicevich was told she was fired for that reason, and never told it was based on performance issues. [43] ¶ 45; [54] ¶¶ 4–5, 7. She was also never told that the stated reason "position elimination" was merely to give her a softer landing and severance. [54] ¶ 7. Skechers itself says that the reason it gave to Dragicevich and in her termination papers were not accurate. [54] ¶ 6; [43-7] at 30 (97:2–7). The "inconsistency casts doubt on the credibility of [Skechers's] proffered reasons for" Dragicevich's termination. *Murphy*, 140 F.4th at 917. A jury could find that Skechers falsely labeled Dragicevich's firing as a position elimination to cover up its actual motivation for firing her. The dishonest reason given by Skechers supports an inference that its real reason for firing Dragicevich was unlawful. *Vichio*, 88 F.4th at 695. A reasonable jury could find that Skechers's termination of Dragicevich was based on her age, in violation of the ADEA.

There's more. Dragicevich provided evidence that she was meeting Skechers's expectations. She said that she was always prepared for her meetings. Indeed, Gigante could not point to one expectation from her emails that Dragicevich did not meet. Indeed, in an informal review, Dragicevich said Gigante was complimentary,

specifically telling her that she was "prepared." And Dragicevich noted that she was always there to assist people who needed it. It is disputed whether Dragicevich was unprepared for meetings and failed to help her colleagues.

Second, younger employees—in fact, those who engaged in the same conduct that Dragicevich did—took over her accounts when Dragicevich was fired. *See Vichio*, 88 F.4th at 693 (hiring a younger employee can provide evidence of pretext); *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 894–95 (7th Cir. 2025) ("similarly situated" employees who are treated differently can provide evidence of pretext). Josh Olkes was under forty years old and engaged in text conversations with Dragicevich criticizing Gigante—the same text message conversations that Gigante considered "insubordinate" when it came to Dragicevich. [43] ¶ 21. However, when asked about Olkes's conduct, Gigante blamed Dragicevich for initiating it: "They were just shooting the shit between the two of them, and her saying nasty things about me and him jumping in." [43-3] at 6 (78:14–17). Yet Gigante also agreed that Olkes's own comments were "inappropriate," "not nice," and "unflattering." [54] ¶ 11. Olkes was never disciplined for his conduct or "negative" communications with Dragicevich. [54] ¶ 13.

In addition, at one point, Gigante had to speak to Olkes about his presence at work and his conduct and appearance during buy meetings. [43] ¶ 60. Gigante testified that Olkes was not very attentive and was not on his game. [43-3] at 48 (198:17–24), 49 (200:5–8). Gigante said that Olkes later improved his conduct, and

16

though Skechers denies that his inattentiveness was the same as Dragicevich's, that is a factual dispute best left to a jury. [43] ¶¶ 60–61.

Similarly, Olkes came to Gigante to complain about Jessica Weakley Anspach, also a team member under forty, telling Gigante he "just [couldn't] take Jessica anymore." [54] ¶ 14; [43-4] at 18. Gigante testified that Weakley Anspach could come off as "abrasive" and "rubbed people the wrong way." [54] ¶ 15; [43-3] at 58 (218:12–21). Weakley Anspach was never disciplined for any negative impact she may have had on the team. [54] ¶ 15. Despite engaging in the same conduct that Dragicevich was supposedly terminated for, neither younger colleague was disciplined in any way for their conduct. In fact, when Dragicevich was fired, her accounts were distributed to these two team members. [43] ¶ 48. This provides more evidence that Skechers's stated reasons for Dragicevich's termination were not true.

A reasonable jury could find that Dragicevich was prepared for meetings, helped her fellow team members, and was terminated for conduct that her younger colleagues were not disciplined for. It could find that the fact that Dragicevich did not know the real reasons for her termination because it was coded as a "position elimination" and that she was never told it was for other reasons indicated that Skechers was trying to hide the real reasons for her firing and provides an inference of unlawfulness. This is enough to allow a jury to find that her age was the reason she was terminated. Summary judgment is denied as to Dragicevich's ADEA claim.

Dragicevich argues in support of her opposition to summary judgment that there was a pattern of discrimination against older employees within Skechers's sales

organization. She points to three facts to support this argument: (1) that people in their fifties and sixties made up a disproportionate number of the people fired under Calichman, [54] ¶¶ 32–35; (2) a vice president of sales told his team that Skechers was "going younger," [54] ¶ 38; and (3) another sales executive made a comment about Dragicevich's age. [54] ¶ 39 First, the pattern of people who were fired is not necessary or relevant to deciding the issues in this case. There is no dispute that Calichman did not have a substantive role in Dragicevich's termination, and no other terminated employee was supervised by Gigante. *See Brooks v. Avancez*, 39 F.4th 424, 439 (7th Cir. 2022) (discriminatory behavior by non-decisionmakers can only support discrimination claim if they proximately caused employee's termination). The other firings are not relevant to Gigante's reasoning for firing Dragicevich.

Second, the comment from another sales vice president to his team is hearsay and not admissible. *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) ("If the evidence is inadmissible hearsay, the courts may not consider it. And when [the statement] contains multiple levels of hearsay, … each layer must be admissible."). Although the comment itself may be a statement of Skechers (admissible as a statement of a party opponent under Fed. R. Evid. 801(d)(2)), Dragicevich did not hear the comment directly. She heard from someone else that it was said. This is an additional level of hearsay that does not fall under any exception. It is excluded.

The comment made to Dragicevich by another sales executive about Dragicevich being "old" is not relevant because there is no evidence that the executive who made the comment had any supervisory control over Dragicevich or her

18

termination. *See Brooks*, 39 F.4th at 439. There is no evidence that Gigante even knew about the comment, much less agreed to the extent that it could be used to impute motivations to her or show that the executive influenced Gigante to fire Dragicevich. *Id.*

Finally, Skechers challenges "but-for causation" by citing Dragicevich's deposition testimony, where Dragicevich said she "believe[d she] was let go because [she] went to HR on February of '23 regarding Christina Gigante and her father, Robert Gigante." [39] at 12. Skechers says this statement "destroy[s]" Dragicevich's ADEA claim. "But for" causation means that but for her age, Dragicevich would not have been fired. *Arnold*, 142 F.4th at 474. Dragicevich's personal belief about why she was fired is not relevant. The "relevant question here is the employer's—not the employee's—honest belief." *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 854 (7th Cir. 2015). As long as Dragicevich can point to evidence showing that Skechers did not honestly believe its asserted reasons for firing her, summary judgment must be denied. There is enough evidence in the record for a reasonable jury to find that Skechers did not fire Dragicevich for performance reasons, but instead, because of her age. Summary judgment on Dragicevich's ADEA claim is denied.

### B.     Title VII Retaliation

The antiretaliation provision of Title VII prohibits an employer from "discriminat[ing] against" an employee who "opposed any practice" that is unlawful under Title VII. 42 U.S.C. § 2000e-3(a). This provision "prevent[s] an employer from interfering (through retaliation) with an employee's efforts to secure or advance

19

enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). In retaliation cases, like employment discrimination cases, the question is "whether the evidence would permit a reasonable factfinder to conclude" that the retaliatory motive "caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021).

A plaintiff makes a prima facie case of retaliation by showing that, *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023):

> (1) she engaged in a statutorily protected activity;
> (2) she suffered an adverse employment action; and
> (3) there is a causal link between her protected activity and the adverse employment action.

Dragicevich claims Skechers retaliated against her for (1) reporting Robert Gigante's "shut up, bitch" comment to Gigante and (2) reporting Gigante's "targeting" of Dragicevich for telling her about the comment. Skechers denies that Dragicevich engaged in statutorily protected activity and that there is any causal link between Dragicevich's complaints and her being terminated.

### 1.    *Complaint to Gigante*

In October 2021, Dragicevich went to Gigante to tell her that Gigante's father had told her to "shut up, bitch." [43] ¶ 63. A report of discrimination must indicate a connection to the protected class or assert facts sufficient to create that inference. *Arnold*, 142 F.4th at 475. The word "bitch" is "gender-specific, and it can reasonably be considered evidence of sexual harassment." *Passananti v. Cook Cnty.*, 689 F.3d 655, 666 (7th Cir. 2012). Dragicevich's report of this language to her supervisor

20

sufficiently creates an inference that she was reporting discrimination based on gender and was protected activity.

"In a Title VII retaliation suit, the plaintiff may submit direct or circumstantial evidence to show that her employer's action was retaliatory." *Huff v. Buttigieg*, 42 F.4th 638, 646–47 (7th Cir. 2022). To establish a causal connection through circumstantial evidence, common categories of evidence are "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Murphy*, 140 F.4th at 918. Dragicevich makes no argument at all about how her termination was causally connected to her 2021 complaint to Gigante. Without any argument about causal connection, and what evidence suggests that Dragicevich's 2023 termination was because of her complaint to Gigante, there is no genuine dispute of fact for a jury to decide.

## 2. Complaint to HR

It is unlawful to retaliate against someone for objecting to an action that was unlawful under Title VII. 42 U.S.C. § 2000e-3(a). Dragicevich claims she reported to HR that she was being retaliated against for reporting discrimination based on sex and then was retaliated against for that report. [43] ¶¶ 52, 67. Because it is unlawful under Title VII to retaliate against someone for reporting sexual harassment, it is also unlawful to retaliate against someone for reporting that unlawful retaliation. Dragicevich's complaint to HR that she was being retaliated against for reporting sex discrimination is a protected activity.

21

Although Dragicevich can prove that she engaged in statutorily protected activity, she cannot prove causation. Gigante did not know about Dragicevich's complaint to HR. [43] ¶ 72. A decisionmaker's knowledge of the protected activity is an essential element of a Title VII retaliation claim. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915–16 (7th Cir. 2022). Though Dragicevich argues that the HR department was "involved in" her termination, the undisputed evidence shows that HR's involvement was solely administrative—the decision to fire Dragicevich had already been made (by Gigante, and Gigante alone) by the time HR was involved. [43] ¶ 43; [43-7] at 22–23 (78:12–79:17); [41-16] at 21 (68:10–13). Because Gigante did not know about Dragicevich's complaint to HR, she could not retaliate against her for reporting to HR. Skechers is entitled to judgment as a matter of law on Dragicevich's retaliation claim.[6]

---

[6] The parties filed a stipulation of dismissal for counts III through VIII of the complaint. [56]. This includes the breach of contract claim for which defendants moved for summary judgment.

22

## V.     Conclusion

Defendant's motion for summary judgment, [38], is granted in part and denied in part. Summary judgment is granted in defendant's favor as to Dragicevich's retaliation claim. Summary judgment is denied as to her age discrimination claim. Pursuant to the parties' stipulation of dismissal, [56], counts III to VIII of the complaint are dismissed with prejudice and with each side bearing their own costs attorneys' fees.

ENTER:

Manish S. Shah
United States District Judge

Date: September 23, 2025